IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| PAMELA ANN GUSTAFSON,<br><br>Plaintiff,<br><br>vs.<br><br>NANCY A. BERRYHILL, Acting<br>Commissioner of the Social Security<br>Administration,<br><br>Defendant. | CV 16-138-BLG-TJC<br><br><br>**ORDER** |

Plaintiff Pamela Ann Gustafson ("Plaintiff") has filed a complaint pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") regarding the denial of Plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 1381-1383f.  (Doc. 1.)  The Commissioner filed an Answer (Doc. 10) and the Administrative Record ("A.R.").  (Doc. 11).

Presently before the Court is Plaintiff's motion for summary judgment, seeking reversal of the Commissioner's denial and remand for further

1

administrative proceedings.  (Doc. 17.)  The motion is fully briefed and ripe for the Court's review.  (Docs. 24, 25.)

For the reasons set forth herein, and after careful consideration of the record and the applicable law, the Court finds the case should be **REMANDED** for further administrative proceedings.

# I.  PROCEDURAL BACKGROUND

On February 19, 2013, Plaintiff filed an application for SSI benefits.  (A.R. 158-166.)  Plaintiff alleged she became unable to work on June 1, 2005.  (A.R. 117.)  At the hearing, Plaintiff's counsel amended the onset date to March 31, 2013.  (A.R. 48.)  The Social Security Administration denied Plaintiff's application initially on August 26, 2013, and upon reconsideration on January 10, 2014.  (A.R. 78-88; 92-104.)  On January 22, 2014, Plaintiff filed a written request for a hearing.  (A.R. 115-117.)  Administrative Law Judge Michele M. Kelley (the "ALJ") held a hearing on December 11, 2014.  (A.R. 34-76.)  On January 30, 2015, the ALJ issued a written decision finding Plaintiff not disabled.  (A.R. 12-23.)  Plaintiff requested review of the decision on April 6, 2015.  (A.R. 7.)  The ALJ's decision became final on July 9, 2016, when the Appeals Council denied Plaintiff's request for review.  (A.R. 1-65)  Thereafter, Plaintiff filed this action.

Plaintiff argues that the ALJ erred in the following ways: (1) improperly discrediting Plaintiff's testimony; (2) failing to give proper weight to the opinion of Plaintiff's medical providers; (3) failing to incorporate depression as an impairment; and (4) failing to incorporate all of Plaintiff's impairments into the vocational consultant's hypothetical questioning. (Doc. 17 at 5.) Plaintiff also complains that the ALJ adopted an RFC that exceeded Plaintiff's capacity, and that the ALJ's decision was internally inconsistent. (*Id.* at 8.)

## II.    LEGAL STANDARDS

### A.    Scope of Review

The Social Security Act allows unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. §§ 405(g), 1383(c)(3). The scope of judicial review is limited. The Court must affirm the Commissioner's decision unless it "is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). *See also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) ("We may reverse the ALJ's decision to deny benefits only if it is based upon legal error or is not supported by substantial evidence."); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Tidwell*, 161 F.3d at 601 (citing *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997)). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten*, 44 F.3d at 1457. In considering the record as a whole, the Court must weigh both the evidence that supports and detracts from the ALJ's conclusions. *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Day v. Weinberger*, 522 F.2d 1154, 1156 (9th Cir. 1975)). The Court must uphold the denial of benefits if the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Flaten*, 44 F.3d at 1457 ("If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary."). However, even if the Court finds that substantial evidence supports the ALJ's conclusions, the Court must set aside the decision if the ALJ failed to apply the proper legal standards in weighing the evidence and reaching a

conclusion. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v. Gardner*, 399 F.2d 532, 540 (9th Cir. 1968)).

### B.      Determination of Disability

To qualify for disability benefits under the Social Security Act, a claimant must show two things: (1) she suffers from a medically determinable physical or mental impairment that can be expected to last for a continuous period of twelve months or more, or would result in death; and (2) the impairment renders the claimant incapable of performing the work she previously performed, or any other substantial gainful employment which exists in the national economy. 42 U.S.C. §§ 423(d)(1)(A), 423(d)(2)(A). A claimant must meet both requirements to be classified as disabled. *Id*.

The Commissioner makes the assessment of disability through a five-step sequential evaluation process. If an applicant is found to be "disabled" or "not disabled" at any step, there is no need to proceed further. *Ukolov v. Barnhart*, 420 F.3d 1002, 1003 (9th Cir. 2005) (quoting *Schneider v. Comm'r of the Soc. Sec. Admin*., 223 F.3d 968, 974 (9th Cir. 2000)). The five steps are:

1. Is claimant presently working in a substantially gainful activity? If so, then the claimant is not disabled within the meaning of the Social Security Act. If not, proceed to step two. *See* 20 C.F.R. §§ 404.1520(b), 416.920(b).

5

2. Is the claimant's impairment severe? If so, proceed to step three. If not, then the claimant is not disabled. *See* 20 C.F.R. §§ 404.1520(c), 416.920(c).

3. Does the impairment "meet or equal" one of a list of specific impairments described in 20 C.F.R. Part 220, Appendix 1? If so, then the claimant is disabled. If not, proceed to step four. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled. If not, proceed to step five. *See* 20 C.F.R. §§ 404.1520(e), 416.920(e).

5. Is the claimant able to do any other work? If so, then the claimant is not disabled. If not, then the claimant is disabled. *See* 20 C.F.R. §§ 404.1520(f), 416.920(f).

*Bustamante v. Massanari*, 262 F.3d 949, 954 (9th Cir. 2001).

Although the ALJ must assist the claimant in developing a record, the claimant bears the burden of proof during the first four steps, while the Commissioner bears the burden of proof at the fifth step. *Tackett*, 180 F.3d at 1098, n.3 (citing 20 C.F.R. § 404.1512(d)). At step five, the Commissioner must "show that the claimant can perform some other work that exists in 'significant numbers' in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id*. at 1100 (quoting 20 C.F.R. § 404.1560(b)(3)).

## III.  FACTUAL BACKGROUND

Plaintiff claims to suffer from severe impairments of degenerative disc disease of the spine and bilateral shoulder osteoarthritis with internal derangement of the right shoulder.  She also asserts she suffers from depression.  She asserts that these impairments render her incapable of performing work she previously performed, or any other substantial gainful employment.

### A.    The Hearing

A hearing was held before the ALJ on December 11, 2014, and the following testimony was provided.  (A.R. 34-76.)

#### 1.    Plaintiff's Testimony

Plaintiff testified she lives alone at the Prairie Tower in Billings, Montana.  (A.R. 42.)  Previously, she lived with her daughter and three grandchildren, ages 8, 5 and 3.  (A.R. 42, 63.)  Plaintiff testified that she recently tried to work at Prairie Tower in the cafeteria.  (A.R. 46-50.)  Plaintiff stated she worked about 20 hours per week, sometimes less.  (A.R. 47.)  Her job included setting tables, filling water pitchers, and delivering tea, coffee, and desserts to tables.  (A.R. 47-49.)  Plaintiff stated she had to use two hands for pouring, and she used a cart to move items.  (A.R. 48.) Someone had to help her lift things that were too heavy for her.  (A.R.

48, 50.)  Plaintiff was let go from her job the day before she had neck surgery in October 2014.  (A.R. 50.)  Plaintiff asked her boss if she could return to work after she recovered, and she was told no.  (*Id.*)  Plaintiff's boss was supposed to write a letter explaining the reasons, but Plaintiff had not received the letter prior to the hearing.  (*Id.*)

As discussed below, Plaintiff had neck surgery approximately two months prior to her hearing before the ALJ.  She testified that her lifting restriction was 7 pounds following her neck surgery.  (A.R. 50.)  Plaintiff was also restricted to not lifting anything above her shoulders.  (*Id.*)  Before surgery, she said she could lift 20 pounds.  (A.R. 51.)

Plaintiff testified that she has difficulty with her fingers on both hands.  (A.R. 52.)  She experiences numbness, shaking and trembling, and drops things.  (*Id.*)  Plaintiff has to have meat cut up for her, and her shaking causes food to fall off her spoon.  (A.R. 53.)  She also needs help opening containers, such as milk, water, and pill bottles.  (A.R. 59.)  Plaintiff stated that she would not be able to do her previous work of soldering because her hands shake.  (A.R.  54.)  Plaintiff indicated she can walk about a block and stand for about 5 minutes before needed a break.  (A.R. 54-55.)

With regard to her mental health, Plaintiff stated that her biggest issue was her memory. (A.R. 56.) Plaintiff stated she had experienced memory problems since her childhood, and had difficulties in school. (A.R. 56-57.) Plaintiff has not been able to remember how to use a computer. (A.R. 57.) Plaintiff stated her memory problems caused her difficulty with her Prairie Tower job because customers would ask for things, and she would forget what they wanted. (A.R. 57-58.) Plaintiff stated that she does better if she's shown how to do something, but she is not able to read directions and follow them. (A.R. 58.) At times during the hearing, Plaintiff responded in a way that indicated she had difficulties with her memory. (*See* A.R. 42-43 (Plaintiff did not remember the street number of Prairie Tower where she lives), 45 (Plaintiff could not remember how long she was married).

As for daily activities, Plaintiff indicated she can drive, and she watches her grandchildren some evenings and weekends. (A.R. 56, 62-63.) Before Plaintiff moved into Prairie Tower, she babysat her grandchildren while her daughter worked. (A.R. 47.)

/ / /

/ / /

2.    Vocational Expert's Testimony

James Fortune, a vocational expert, also testified before the ALJ. (A.R. 64-75.) The ALJ asked Mr. Fortune three hypothetical questions. First, the ALJ asked Mr. Fortune to assume a person the same age as Plaintiff, and with the same work history and educational background, who could lift 10 pounds frequently and 20 pounds occasionally, walk and stand for 6 hours and sit for more than 6 hours in an 8-hour workday, could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance stoop, kneel, crouch and crawl, and who could frequently handle, and could reach to the front, laterally, and overhead with both upper extremities. (A.R. 70.) Mr. Hall testified the hypothetical individual would be able to perform Plaintiff's past work as an office manager and assembler. (*Id.*)

Second, the ALJ asked Mr. Fortune to assume the same person but with the limitation that the person cannot lift her arms over shoulder level, and also cannot climb ladders, ropes and scaffolds, and cannot be exposed to work hazards. (A.R. 71.) Mr. Hall stated that would not change his prior answer. (*Id*.)

Third, the ALJ asked Mr. Hall to assume the same person, but with the requirement the person would be off task 20 percent of an 8-hour workday. (A.R.

72-73.)  Mr. Fortune stated the individual could not perform Plaintiff's past jobs, as actually performed or as generally performed in the national economy.  (*Id.*)

Plaintiff's counsel asked Mr. Fortune whether the person discussed in the ALJ's first hypothetical would be capable of performing Plaintiff's prior jobs if the person were limited to only occasionally handling and fingering.  (A.R. 74.)  Mr. Fortune stated that would eliminate both of Plaintiff's prior jobs.  (A.R. 75.)  Next, Plaintiff's counsel asked if there would be jobs available if the person was limited to lifting seven pounds.  (*Id.*)  Mr. Fortune responded that would make her unable to perform light and sedentary work.  (*Id.*)

## B.    Medical Evidence

The administrative record includes Plaintiff's medical records from several health care providers.  The Court has summarized only those records that are relevant to the specific issues presented for review.

### 1.    Medical Evidence Relating to Physical Impairments

#### a.    *RiverStone Health*

Plaintiff established care at RiverStone Health in October 2012 after moving to Montana from Oklahoma.  (A.R. 254-57.)  It appears Plaintiff saw several different providers at RiverStone.  (A.R. 239-61; 323-31; 455-82.)

On December 7, 2012, Plaintiff was seen by Seth Wilson, PA-C, for right shoulder pain. (A.R. 242-43.) Plaintiff complained of pain radiating down her right arm to her fingers. (A.R. 242.) She also complained of numbness in the fingers of her right hand. (*Id.*) A physical examination showed decreased range of motion, positive cross arm test and positive impingement sign. (A.R. 242-43.) Drop arm test and Hawkins test were negative. (A.R. 243.)

On December 13, 2012, an x-ray was taken of Plaintiff's cervical spine. (A.R. 260.) The x-ray showed degenerative endplate changes with disc space narrowing at C3-C4 and most probably C4-C5, C5-C6, and C6-C7, and moderate changes at C7-T1. (*Id.*)

On December 26, 2012, an MRI of Plaintiff's right shoulder showed a significantly abnormal rotator cuff, with a complete tear of the supraspinatus tendon, with acromioclavical fractures predisposing to impingement. (A.R. 258-59.) The MRI also showed hypertrophic, degenerative glenohumeral arthropathy, and abnormal superior labrum. (*Id.*)

Plaintiff returned to RiverStone Health on January 3, 2013 for a follow-up regarding her MRI. (A.R. 239-40.) Plaintiff was referred to orthopedics. (*Id.*) Thereafter, Plaintiff's orthopedic care was provided through Billings Clinic.

Between January 2014 and June 2014, Plaintiff returned to RiverStone Health, and complained about neck pain. (A.R. 449-463.) She was instructed to follow-up with her provider at Billings Clinic. (*Id.*)

b. *Billings Clinic*

On February 12, 2013, Plaintiff saw Dr. Guy Schmidt, M.D. at Billings Clinic for her right shoulder. (A.R. 313-14.) Dr. Schmidt injected a lidocaine mixture into Plaintiff's shoulder, and referred her to physical therapy. (A.R. 314.) In a follow-up appointment on March 26, 2013, Plaintiff indicated she had good relief from the injection. (A.R. 312.)

On April 10, 2013, Plaintiff saw Dr. Eugen J. Dolan, M.D. for neck pain, bilateral shoulder pain and arm numbness. (A.R. 296-298.) Plaintiff stated her right shoulder was doing well, but she was having neck pain with numbness and tingling in both arms. (A.R. 296.) Plaintiff reported that she was dropping things more often. (*Id.*) Plaintiff was scheduled for an EMG to test for carpal tunnel syndrome, and a CT and myelogram of the cervical spine. (*Id.*)

On April 24, 2013, the CT and myelogram were done. (A.R. 291-95.) The results showed that at C5-6, Plaintiff had an incomplete fusion, at C3-4, severe joint hypertrophy on the left, at C4-5, severe joint hypertrophy bilaterally with

right-side moderate and left-side severe foraminal stenosis.  (A.R. 287.)  C5-6 also had mild right-side encroachment, and C6-7 had moderate right-side foraminal encroachment.  (*Id.*)  On April 25, 2013 the EMG was performed by Dr. Scott Riggins, M.D.  (A.R. 301-04.)  Dr. Riggins noted Plaintiff had a history of intermittent paresthesia involving all the digits of both hands, with the right greater than the left.  (A.R. 301.)  The EMG results came back normal.  (A.R. 303.)

On May 22, 2013, Dr. Bradley McPherson, M.D. performed medial branch nerve blocks at C3-4, C4-5, and C5-6.  (A.R. 282-86.)

On June 6, 2013 Plaintiff returned to see Dr. Schmidt for a follow-up regarding her right shoulder.  (A.R. 280.)  At that point, Plaintiff reported that the injections she had were providing her with relief.  (*Id.*)  Plaintiff stated that she was doing very well at home, was able to do her hair, and all activities of daily living, but she had difficulty stirring mashed potatoes.  (*Id.*)

On July 2, 2013, Plaintiff saw Dr. McPherson again regarding her neck.  (A.R. 276-79.)  Dr. McPherson noted that the medial nerve blocks provided Plaintiff little relief.  (A.R. 276.)  Therefore, Dr. McPherson performed a cervical epidural steroid injection to the C5-6 level.  (*Id.*)

Approximately one year later, on June 10, 2014, an MRI of Plaintiff's cervical spine was performed. (A.R. 373-74.) The MRI was ordered because Plaintiff was experiencing neck pain with radicular symptoms. (A.R. 373.) The results of the MRI showed Plaintiff had disc degeneration throughout the cervical spine with multilevel disc space narrowing, most prominent at C4-5, C5-6, and C6-7. (A.R. 374.) Degenerative endplate signal changes or osseous edema had developed at C3-4, and patchy central cord signal abnormality had developed at C4-5, compatible with myelomalacia or cord edema. (*Id.*) There was also severe left and moderate right neural foraminal encroachment. (*Id.*)

On July 28, 2014, Plaintiff saw Dr. Dolan again regarding her neck. (A.R. 375-76.) Plaintiff stated that the steroid injection she had in July 2013 worked fairly well for a while, but for the past 3-4 months, she had been experiencing increased pain in her neck, and more bilateral hand numbness. (A.R. 375.) Plaintiff reported that her hand numbness was more prevalent at night. (*Id.*) Upon physical exam, Dr. Dolan noted Plaintiff had a "very positive Tinel's at the left elbow." (*Id.*) Dr. Dolan also indicated he reviewed her June 2014 MRI, and stated not much had changed, with "one glaring exception . . . She now has cord edema

noticeable at the C4-5 which was not present previously." (A.R. 376.) Dr. Dolan ordered another EMG study. (*Id.*)

The second EMG was performed on August 8, 2014. (A.R. 378-80.) The test showed active and chronic neurogenic changes in a pattern that was most consistent with C5 or C6 radiculopathy of the left. (A.R. 379.) It also showed chronic neurogenic changes in abductor digiti minimi of uncertain etiology. (*Id.*)

On September 8, 2014, Dr. Dolan noted the EMG study suggested chronic C5 and C6 radiculopathy without any evidence of carpal tunnel or ulnar nerve problems. (A.R. 336.) Dr. Dolan concluded that Plaintiff needed a three level fusion in her neck at C3, C4, C5, and C6. (*Id.*)

On September 30, 2014, Plaintiff saw Dr. Dolan for a preoperative examination. (A.R. 388-91.) He indicated her surgery would involve C4 and C5 laminectomies, C3-4, C4-5, and C5-6 foraminotomies, and posterior fusion from C3 to C6. (A.R. 388.) Plaintiff reported having neck pain and numbness radiating down both arms, especially affecting the second and third fingers on both hands symmetrically. (A.R. 390.) Dr. Dolan stated that due to Plaintiff's longstanding symptoms with no improvement with conservative measures, neck surgery was appropriate. (*Id.*)

Plaintiff's neck surgery was performed on October 3, 2014. (A.R. 398-403.) Plaintiff was hospitalized until October 8, 2014. (A.R. 404.) Her discharge summary indicated that she was not able to tolerate morphine, and therefore it was discontinued and the only thing she was given for pain control was Tylenol. (A.R. 404.)

On October 16, 2014, Plaintiff was seen by Randal W. Pearson, PA for a post-operative visit. (A.R. 446-48.) At that point, Plaintiff reported she was doing extremely well at home and had no significant neck pain. (A.R. 446.) Plaintiff indicated that she wanted to increase her activities. (*Id.*) Upon examination, Mr. Pearson noted Plaintiff had full cervical range of motion and full range of motion with her arms up and over her head without limitation. (*Id.*) He indicated her lifting restriction was 15 pounds at that time, and Plaintiff was instructed to limit overhead motion as much as possible. (A.R. 447.) Approximately one week later, Plaintiff was seen back at RiverStone Health, and indicated she was having some neck pain and muscle stiffness. (A.R. 479.)

c.     *Brian Schnitzer, M.D.*

On June 11, 2013, Plaintiff was examined by Dr. Brian Schnitzer, M.D., at the request of the Disability Determination Services of the Montana Department of

Public Health and Human Services. (A.R. 267-72.) Dr. Schnitzer noted that during Plaintiff's physical exam she was ambulating without difficulty, was able dress and undress herself and position herself on the examination table without help. (A.R. 268.) Dr. Schnitzer stated Plaintiff had good range of motion in her extremities, but had subjective discomfort with range of motion. (A.R. 269.) Dr. Dr. Schnitzer noted there was evidence of significant degenerative disc disease in her lower back, and that Plaintiff voiced subjective discomfort in the activities required for his examination. (A.R. 269.) Nevertheless, he stated she was capable of completing all the activities asked of her, and she did not seem limited in her activities. (*Id.*) Dr. Schnitzer stated Plaintiff's grip strength and gross handling/fine fingering seemed well maintained. (*Id.*) Dr. Schnitzer ordered an x-rays of Plaintiff's hip and lumbar spine. (*Id.*) The hip x-ray was normal, but the lumbar spine showed evidence of advanced multilevel degenerative disc disease at L3-S1. (A.R. 271-72.) Dr. Schnitzer opined that he "would imagine" Plaintiff was capable of many work-related activities. (A.R. 269.)

> d. *Ernest Godfread, M.D. and William Fernandez, M.D.*

Non-examining physician, Dr. Ernest Godfread, M.D. opined that as of August 2013, Plaintiff could lift 20 pounds occasionally, and 10 pounds frequently.

(A.R. 85.)  He further opined that Plaintiff had manipulative limitations.  (A.R. 86.)  He stated reaching in front, laterally, and overhead with her right arm was limited and handling was limited on her right.  (*Id.*)  Upon reconsideration of the initial denial of Plaintiff's claim, non-examining physician, Dr. William Fernandez, M.D. agreed with Dr. Godfread's limitations.  (A.R. 98, 100-01.)

### 2. Medical Evidence Relating to Depression

#### a. *Troy Stiles, D.O.*

On June 25, 2013, Plaintiff saw Dr. Troy Stiles, D.O. at Big Sky Psychiatric Services for depression.  (A.R. 273-275.)  Dr. Stiles noted that Plaintiff had been taking Paxil, and felt it was helpful, but sometimes it did not seem like enough.  (A.R. 273.)  Plaintiff reported that she had a 50/50 split of good and down days.  (*Id.*)  Plaintiff also reported daily panic attacks and trouble sleeping.  (*Id.*)  Dr. Stiles increased Plaintiff's dose of Paxil, and prescribed Trazodone to assist with Plaintiff's insomnia.  (A.R. 275.)  Plaintiff saw Dr. Stiles on December 19, 2013 for a follow-up appointment, and reported that she was doing "quite a bit better since she increased the Paxil."  (A.R. 348-50.)  Plaintiff stated that she would get sad or anxious but not to the point that she could not stop the worries or sadness,

and that her anxiety "has all but left."  (A.R. 348.)  Plaintiff did not report any other issues.  (*Id.*)

Plaintiff saw Dr. Stiles again on April 9, 2014.  (A.R. 351-53.)  Again, she reported she was doing very well, and she felt the Paxil had worked well to control her anxiety and depression.  (A.R. 351.)  On November 5, 2014, Dr. Stiles noted Plaintiff was doing pretty well overall, but had been feeling a little worse the past two months because she lost her job at Prairie Tower.  (A.R. 484.)  Plaintiff told Dr. Stiles she lost her job "due to some write ups."  (*Id.*)

### b. *Lori Denton, LCPC*

On November 23, 2012, Plaintiff saw Lori Denton at the Community Crisis Center for an MHSP evaluation.  (A.R. 332-345.)  Ms. Denton noted in her initial evaluation that Plaintiff suffered from depression.  (A.R. 342.)  Plaintiff indicated she was having some sleep disturbances, and problems with concentration and memory.  (A.R. 337.)  Plaintiff also reported having learning disabilities, but was able to graduate from high school.  (A.R. 335.)  Plaintiff expressed a fear of becoming homeless due to her depression and back injury.  (A.R. 345.)

/ / /

/ / /

### c. *Sandra McKee, LCPC*

From January 2014 through June 2014, Plaintiff saw Sandra McKee at RiverStone Clinic for counseling services. (A.R. 354-372.) Ms. McKee noted that Plaintiff had depression with anxiety. (A.R. 354.) During her sessions with Ms. McKee, Plaintiff generally discussed issues relating to her family and dealing with childhood trauma and grief. On March 7, 2014, Ms. McKee indicated Plaintiff had moderately severe depression that was exacerbated by winter. (A.R. 362.) Two weeks later, on March 17, 2014, Ms. McKee downgraded Plaintiff's depression to mild. (A.R. 364.) That same date, Plaintiff reported that she did not think she could work due to her mental condition. (*Id.*) On April 10, 2014, Ms. McKee indicated Plaintiff was feeling better, and noted her depression was "in partial remission." (A.R. 368.) On May 8, 2014, Plaintiff told Ms. McKee that she got a job at Prairie Tower, and would be working 28 hours a week. (A.R. 370.) She also noted that she had some unexplained feelings of depression. (*Id.*)

### d. *Tristan Sophia, Psy.D.*

On March 12, 2013, Plaintiff was evaluated by Tristan Sophia, Psy.D., for a consultive psychological evaluation. (A.R. 262-65.) Dr. Sophia opined that there were no mental health issues preventing Plaintiff from being employed. (A.R.

265.)  Dr. Sophia noted that Plaintiff had depression and was prescribed Paxil. (A.R. 263.)  Dr. Sophia stated Plaintiff showed no difficulty expressing herself or understanding the examiner; her attention and concentration were adequate; her thought processes were logical and relevant; she did not demonstrate any deficits in social judgment or decision making; and her social functioning did not appear impaired.  (A.R. 263-64.)

Dr. Sophia conducted a MAS examination to measure Plaintiff's cognitive functioning.  (A.R. 264.)  The results showed Plaintiff had normal visual memory, but deficits (although not significant) in short-term memory and verbal memory. (*Id.*)  In regard to test taking behavior, Dr. Sophia stated Plaintiff sometimes did not engage in a trial and error approach to problem solving, and she showed an adverse reaction to failure and challenges.  (A.R. 263.)  Dr. Sophia remarked that Plaintiff can complete daily living skills independently, except that her daughter washes her back because she cannot reach that far.  (A.R. 264.)  Plaintiff reported she could use a telephone, computer, buy her own clothes, grocery shop, cook meals, drive/use public transportation and maintain the cleanliness of her room. (*Id.*)  Plaintiff was also able to care for her three grandchildren when her daughter

works.  (*Id.*)  Dr. Sophia further stated Plaintiff has adequate ability to sustain focused attention long enough to allow a timely completion of tasks.  (A.R. 265.)

           e.     *Ed Kehrwald, Ph.D. and Robert Bateen, Ph.D.*

Non-examining psychological consultants Ed Kehrwald, Ph.D. and Robert Bateen, Ph.D. both opined that Plaintiff had mild limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence, and pace, and had no episodes of decompensation of an extended duration.  (A.R. 83, 99.)  Dr. Kehrwald further stated Plaintiff had a history of learning weaknesses in school and some weak verbal memory, but that her nonverbal memory was fine.  (*Id.*)  He also noted Plaintiff had some depression with sad affect and mood, but adequate energy and attention.  He found there were no significant limitations in Plaintiff's functions.  (*Id.*)  Dr. Bateen agreed with these assessments.  (A.R. 99.)

    **C.**    **The ALJ's Findings**

The ALJ followed the five-step sequential evaluation process in considering Plaintiff's claim.   First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 16, 2012.  (A.R. 14.)  The ALJ noted that Plaintiff had worked after the application date at the Prairie Tower cafeteria, but the work activity did not arise to the level of substantial gainful activity.  (*Id.*)  Second, the

ALJ found that Plaintiff has the following severe impairments: "degenerative disc disease of the spine and bilateral shoulder osteoarthritis with internal derangement of the right shoulder." (*Id.*) The ALJ also noted that Plaintiff had been diagnosed with depression, anxiety, PTSD, hypertension, hyperlipidemia, and restless leg syndrome. (A.R. 15.) But the ALJ did not find these impairments were severe. (*Id.*) With regard to depression, anxiety and PTSD, the ALJ found the impairments did not cause more than minimal limitation in Plaintiff's ability to perform basic mental work and activities. (*Id.*)

Third, the ALJ found Plaintiff does not have an impairment or combination of impairments that meets or medically equals any one of the impairments in the Listing of Impairments. (A.R. 17.) Fourth, the ALJ found that Plaintiff has the residual functional capacity to:

> perform light work as defined in 20 CFR 416.967(b), where the claimant could lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally. The claimant could walk and stand for six hours out of an eight-hour workday, and sit for more than six hours in an eight-hour workday, but at least six hours. She could never climb ladders, ropes, and scaffolds, but could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. She can frequently handle and reach to the front, laterally, and overhead with both upper extremities. The claimant cannot lift her arms over shoulder level and cannot be exposed to work hazards, such as wet, slippery, or uneven surfaces, unprotected heights, and inherently dangerous machinery.

24

(A.R. 18.)

The ALJ determined Plaintiff was unable to perform her past relevant work as an Office Clerk and Assembler. (A.R. 22.) Thus, the ALJ found that Plaintiff was not disabled. (*Id.*)

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred by failing to provide specific germane reasons for discounting her credibility, erroneously discounting the opinions of treating physicians and other source medical providers, erroneously ignoring depression as an impairment, and failing to include all impairments in the hypothetical to the vocational expert. The Commissioner argues the ALJ reasonably found that Plaintiff's activities were inconsistent with her alleged limitations, and that objective medical evidence contradicted Plaintiff's statements concerning her symptoms and limitations. The Commissioner further argues the ALJ properly determined Plaintiff's severe impairments.

### A.  The ALJ's Credibility Determination

Plaintiff argues that the ALJ's credibility determination was erroneous because the ALJ made only a general credibility finding without providing clear and convincing reasons for rejecting her testimony. Plaintiff further argues that her

testimony was fully supported by the objective medical evidence. The Commissioner counters that the ALJ properly evaluated Plaintiff's credibility.

The credibility of a claimant's testimony is analyzed in two steps. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective evidence of an impairment or impairments that could reasonably be expected to produce the pain or other symptoms alleged. *Id.* Second, if the claimant meets the first step, and there is no affirmative evidence of malingering, the ALJ may reject the claimant's testimony only if she provides "specific, clear and convincing reasons" for doing so. *Id.*

"In order for the ALJ to find [the claimant's] testimony unreliable, the ALJ must make 'a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.'" *Turner v. Commissioner of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). "General findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints." *Reddick*, 157 F.3d at 722 (quoting *Lester*, 81 F.3d at 834)). The clear and convincing standard "is not an easy requirement to meet: '[It] is the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759

F.3d 995, 1015 (9th Cir. 2014).

Here, the first step of the credibility analysis is not at issue. The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause her symptoms, and there is no argument that Plaintiff is malingering. Therefore, the ALJ was required to cite specific, clear and convincing reasons for rejecting Plaintiff's subjective testimony about the severity of her impairments. The Court finds the ALJ failed to so.

In addressing Plaintiff's credibility, the ALJ identified Plaintiff's testimony about her ability to walk and stand. (A.R. 19.) The ALJ stated she discredited Plaintiff's testimony because Plaintiff was able to work part time after the disability onset,[1] it did not appear Plaintiff left her job due to her impairments, and Plaintiff's activities of daily living were inconsistent with having disabling impairments. (A.R. 19.) The Court finds these observations are supported in the

---

[1] Plaintiff argues the ALJ made a factual error with regard the number of hours per week she was working at Prairie Tower. The ALJ stated Plaintiff was working 28 hours per week. (A.R. 19.) Plaintiff asserts she only worked about 20 hours a week. (A.R. 47.) Plaintiff's earning record from Prairie Tower reflect that she worked an average of 19 hours per week. (A.R. 176.) However, a treatment note from her counselor, Ms. McKee stated Plaintiff would be working 28 hours a week. (A.R. 370.) Given the discrepancy in the record, the Court does not find the ALJ's factual finding in this regard was clearly erroneous.

record.  (*See* A.R. 46-50; 56, 62-63, 264, 484.)

But the ALJ did not mention Plaintiff's testimony about her impaired ability to use her hands, or cite specific, clear, and convincing reasons for rejecting her testimony on this point.  For example, the ALJ did not discuss Plaintiff's testimony that she has difficulty with her fingers on both hands, and experiences numbness, shaking and trembling, which causes her to drops things, makes it hard to open containers, and prevents her from performing her past job of soldering.  Moreover, although the ALJ summarized Plaintiff's medical records regarding her physical conditions, the ALJ did not link Plaintiff's testimony to any particular part of the record that would support her non-credibility determination.

In *Brown-Hunter*, 806 F.3d at 489, the Ninth Circuit held an ALJ fell short of providing specific, clear, and convincing reasons for rejecting a claimant's testimony by merely reciting the medical evidence in support of his RFC finding.  The Court explained that summarizing the medical record "is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible."  *Id.* at 494 (emphasis in original).  The Ninth Circuit also emphasized that the ALJ must identify specifically *which* of the claimant's statements she found not credible and *which* evidence contradicted that testimony.

*Id.* at 493-494.

Here, the most pertinent statement from the ALJ was that Plaintiff had reported "doing extremely well at home" following her neck surgery, and had full range of motion without limitations. (A.R. 20-21.) From that, it might be inferred that the ALJ did not believe Plaintiff's statements about the extent to which her hands remained an issue. But the Court is not permitted to make such inferences. *See Brown-Hunter*, 806 F.3d at 494 (explaining the district court may not draw inferences from the ALJ's summary of the medical record to find a basis for the adverse credibility determination where the ALJ did not himself draw those conclusions).

Without the required specificity, the Court cannot meaningfully review the ALJ's decision to determine whether the ALJ arbitrarily discredited Plaintiff's testimony. *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) ("[T]he ALJ must make a credibility determination with findings sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."); *Brown-Hunter*, 806 F.3d at 492 ("[A]lthough we will not fault the agency merely for explaining its decision with 'less than ideal clarity,' . . . we still demand that the agency set forth the reasoning behind its decision in a way that

allows for meaningful review.") (citation omitted).

Because the ALJ failed to point to the specific parts of Plaintiff's testimony she found not credible, and failed to link that testimony to particular parts of the record, the ALJ erred. *Brown-Hunter*, 806 F.3d at 494. As such, the Court finds that the ALJ's credibility finding is not supported by specific, clear, and convincing reasons with respect to Plaintiff's use of her hands. The Court further finds that the error is not harmless.

An ALJ's error is harmless if it is "inconsequential to the ultimate nondisability determination." *Carmickle v. Comm'r Soc. Sec. Admin.*, 533 F.3d 1155, 1162 (9th Cir. 2008). Here, the vocational expert testified that if Plaintiff were limited to occasionally handling or fingering, she would not be able to perform her past work as an assembler. (A.R. 75.) Accordingly, a proper determination of Plaintiff's credibility may affect the outcome of Plaintiff's disability claim.

## B.     Treating Physician and Other Medical Source Evidence

Plaintiff argues the ALJ failed to give proper weight to the opinions of Dr. Troy Stiles, as well as counselors Sandra McKee and Lorri Denton. The

Commissioner has not responded to Plaintiff's argument in this regard. Nevertheless, the Court finds the ALJ's omission was not erroneous.

The record contains treatment notes from Dr. Stiles, Ms. McKee and Ms. Denton. (A.R. 273-75; 332-45; 348-72 484-86.) But none of these medical providers offered medical opinions concerning Plaintiff's functional capacity. The ALJ's opinion clearly indicates she considered the treatment notes, but the ALJ did not assign a specific weight to them. (A.R. 16.)

Treatment notes, in general, do not constitute medical opinions. *See* 20 C.F.R. § 416.927(a)(2) ("Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."). Because the providers did not offer opinions regarding Plaintiff's limitations or ability to work, their treatment notes do not constitute medical opinions the ALJ must weigh. *See Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223 (9th Cir. 2010) (holding that where a physician's report did not assign any specific limitations or opinions regarding the claimant's ability to work, "the ALJ did not need to provide 'clear

and convincing reasons' for rejecting [the] report because the ALJ did not reject

any of [the report's] conclusions.").

Accordingly, the ALJ did not err by failing to assign a weight to the

treatment notes of Dr. Stiles, Ms. McKee, or Ms. Denton.

### C.     Consideration of Depression as an Impairment

Plaintiff next argues the ALJ failed to consider depression a severe

impairment.  The Commissioner argues that because the ALJ found Plaintiff had

other severe impairments and continued her analysis beyond step two, any error in

designating specific impairments severe did not prejudice Plaintiff.  The

Commissioner further asserts the ALJ properly determined that Plaintiff's mental

impairments were mild.

Under step two of the sequential evaluation process, the ALJ must determine

whether the claimant suffers from a severe impairment or combination of

impairments.  20 C.F.R 404.1520(c); 416.920.  At the step two inquiry, "the ALJ

must consider the combined effect of all of the claimant's impairments on her

ability to function, without regard to whether each alone was sufficiently

severe." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996)).  The Social

Security Act defines a "severe" impairment as one "which significantly limits [a

claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §

404.1520(c).  "An impairment or combination of impairments may be found 'not

severe *only* if the evidence establishes a slight abnormality that has no more than a

minimal effect on an individual's ability to work.'"  *Webb v. Barnhart*, 433 F.3d

683, 686 (9th Cir. 2005) (quoting *Smolen*, 80 F.3d at 1290).  The step two "inquiry

is a de minimis screening device [used] to dispose of groundless claims," *Smolen*,

80 F.3d at 1290.

Here, the ALJ conducted a fairly thorough analysis at step two regarding the

severity of Plaintiff's medically determinable mental impairments.  (A.R. 15-17.)

The ALJ discussed each of the four broad functional areas for evaluating mental

disorders, known as the "paragraph B" criteria.  (*Id.*)  The ALJ concluded that

Plaintiff suffered from mild limitations in each of the functional areas.  (*Id.*)  The

ALJ's observations are consistent with the evidence in the record.  (*See* A.R. 83-

84; 98-99; 262-66; 273-75; 332-53; 484-86.)  Accordingly, the ALJ's finding of

non-severity was supported by substantial evidence.

A finding of non-severity at step two does not, however, relieve the ALJ

from further considering an impairment.  At step four of the sequential evaluation

process, the AJL must determine the claimant's RFC.  20 C.F.R. §

404.1545(a)(5)(i).  The RFC represents the most the claimant can do in a work setting despite the claimant's physical and mental limitations.  20 C.F.R. § 404.1545(a)(1).  In assessing the RFC, the ALJ must consider the "limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'  While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim."  SSR 96-8P, 1996 WL 374184, * 5 (S.S.A. July 2, 1996). *See also* 20 C.F.R. § 404.1545(e).

As the ALJ noted, the RFC assessment "requires a more detailed assessment" than the assessment of whether an impairment is severe at step two.  (A.R. 17.)  Rather than providing a detailed assessment, however, the ALJ stated only that "the following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."  (*Id.*)  The ALJ did not explain how she determined Plaintiff's depression, anxiety and PTSD would not lead to RFC limitations when considered together with Plaintiff's other severe impairments.  When a claimant's impairments are supported by substantial evidence in the record, the ALJ must either consider them in the RFC or cite

reasons for excluding them. *See Robbins v. Social Sec. Admin.*, 466 F.3d 880, 886

(9th Cir. 2006). The ALJ may not simply ignore them. *Id.* (stating the ALJ "is not

free to disregard properly supported limitations.").

Therefore, although the ALJ found Plaintiff's mental impairments were not

severe, the ALJ was still required to consider whether any limiting effects of her

depression, anxiety and PTSD, in combination with her other severe impairments,

affected her ability to work.

Accordingly, the Court finds the ALJ erred by failing to consider Plaintiff's

mental impairments in the RFC or explaining why she excluded them. The Court

further finds that the error was not harmless. It is possible Plaintiff's mental

impairments, when considered together with her other limitations or restrictions,

may be critical to the outcome of her claim. *Carmickle v. Comm'r, Soc. Sec.

Admin.*, 533 F.3d 1155, 1164 (9th Cir. 2008).

### D.  Failure to Incorporate Impairments into Hypothetical Questions Posed to the Vocational Expert.

Hypothetical questions posed to the vocational expert must set out all the

limitations and restrictions of the particular claimant. *Embrey v. Bowen*, 849 F.2d

418, 422 (9th Cir. 1988). "The testimony of a vocational expert 'is valuable only

to the extent that it is supported by medical evidence.'" *Magallanes*, 881 F.2d 747,

756 (9th Cir. 189) (quoting *Sample*, 694 F.2d 639, 644 (9th Cir. 1982)).  If the

assumptions in the hypothetical are not supported by the record, then the

vocational expert's opinion that the claimant has a residual working capacity has

no evidentiary value.  *Embrey*, 849 F.2d at 422.  *See also Shumaker v. Astrue*, 657

F.Supp.2d 1178, 1180 (D. Mont. 2009) (holding where the ALJ's hypothetical

questions did not accurately reflect the claimant's restrictions established by the

medical record, "the ALJ's determination that [the claimant] could perform other

work existing in the national economy does not rest on substantial evidence").

As discussed above, the Court has determined the ALJ failed to adequately

consider Plaintiff's limitations caused by her mental impairments, and did not

adequately support her reasons for discrediting Plaintiff's testimony regarding her

limitations with her hands.  Accordingly, these errors may have infected the

hypothetical that the ALJ relied on, and in turn, the ALJ's determination that

Plaintiff could perform her past relevant work.  Therefore, the Court finds the

ALJ's determination at step four is not supported by substantial evidence.

## V.    REMAND OR REVERSAL

Plaintiff asks the Court to remand this case further proceedings.  "[T]he

decision whether to remand a case for additional evidence or simply to award

benefits is within the discretion of the court." *Reddick v. Chater*, 157 F.3d at 728.

If the ALJ's decision "is not supported by the record, 'the proper course, except in

rare circumstances, is to remand to the agency for additional investigation or

explanation.'" *Hill v. Astrue*, 698 F.3d 1153, 1162 (9th Cir. 2012) (quoting

*Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004)).  "If additional

proceedings can remedy defects in the original administrative proceedings, a social

security case should be remanded.  Where, however, a rehearing would simply

delay receipt of benefits, reversal [and an award of benefits] is appropriate." *Lewin*

*v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981).

The Court finds remand for further proceedings is appropriate.  On remand,

the ALJ shall incorporate all of the limitations related to Plaintiff's mental

impairments in the RFC,[2] or cite reasons for excluding them.  In addition, the ALJ

shall reconsider Plaintiff's credibility regarding the use of her hands.  Finally, the

ALJ shall reassess whether Plaintiff can perform her past work or other work in the

---

[2] Curiously, the RFC states that Plaintiff "cannot lift her arms over should level,"
but can frequently "reach to the front, laterally, and overhead with both upper
extremities."  (A.R. 18.)  These two limitations appear facially incompatible.
Thus, on remand, the ALJ is directed to reassess this apparent contradiction.

national economy based upon a hypothetical to the vocational expert that incorporates of all the limitations supported by the record.

## VI.    CONCLUSION

Based on the foregoing, **IT IS ORDERED** that the Commissioner's decision be **REVERSED** and this matter be **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**IT IS ORDERED**.

DATED this 26th day of March, 2018.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge